1

1

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3

UNITED STATES OF AMERICA          :

4

        v.                        :   CRIMINAL NO. 1:CR-00-119-03
                                      (Judge Kane)

5

JOHN WATSON,                      :
                Defendant

6

7

8

9

TRANSCRIPT OF PROCEEDINGS

10

REVOCATION OF DETENTION ORDER

11

Before:  Hon. Yvette Kane, Judge

12

Date:  October 13, 2000

13

Place:  Courtroom No. 4
                Federal Building

14

Harrisburg, Pa.

*FILED*
*HARRISBURG, PA*
*JUL 0 5 2005*
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

15

16

17

COUNSEL PRESENT:

18

        WILLIAM A. BEHE, Assistant U.S. Attorney

19

                For - Government

20

        JAMES WADE, Esquire
        THOMAS A. THORNTON, Esquire

21

22

                For - Defendant

23

24

25

Monica L. Zamiska, RPR
Official Court Reporter

INDEX TO WITNESSES

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Defendant: | | | | |
| Caroline Robinson | 4 | | | |
| Lisa Denise Watson | 14 | 15 | | |
| Lawrence Bethea | 18 | 19 | | |

INDEX TO EXHIBIT

|  | Identified | Admitted |
|---|---|---|
| For the Defendant: | | |
| D X 1 (letter from Harrisburg High School athletic director) | 20 | |

1          MR. BEHE:  Good morning, Your Honor.  This is the

2    matter of the United States of America v. John Watson, which

3    is at No. 1:CR-00-119.  May the record reflect that Mr.

4    Watson is present in court with counsel Mr. Wade and Mr.

5    Thornton of the Federal Public Defender's Office.  Now is the

6    time and place set by the Court on a hearing or for a hearing

7    on the defendant's motion for revocation of the pretrial

8    detention order that was entered in this matter.

9          THE COURT:  All right.  Just a few minutes ago, Mr.

10   Behe, I was informed that there is a superseding indictment

11   in this case.

12         MR. BEHE:  Yes, Your Honor, it was returned

13   Wednesday.

14         THE COURT:  Mr. Wade, are you aware of that?

15         MR. WADE:  I received a copy of it this morning,

16   Your Honor.  I have to admit I have not had a chance to look

17   at it.

18         THE COURT:  I haven't either.

19         Mr. Behe, is it -- are there new allegations of

20   transactions that were not included in the original

21   indictment?

22         MR. BEHE:  Yes, Your Honor, the superseding

23   indictment differs from the original indictment in the

24   following respects:  Mr. Elliott no longer is in this

25   indictment because he has signed a plea agreement which had

1    been filed with the court.  There is an additional count that

2    has been added, and that I believe is Count 7, which

3    charges -- yes, Count 7, which charges the defendant here

4    specifically with being involved from around January of 1999

5    up to March 15 of this year with distributing and possessing

6    with the intent to distribute cocaine and 50 grams or more of

7    crack cocaine.  That is a charge that had not been in the

8    original indictment, but all other charges are essentially

9    the same or exactly the same with regard to Mr. Watson.

10              THE COURT:  All right.  Not good news, Mr. Wade.

11              MR. WADE:  No, Your Honor.

12              THE COURT:  Do you want to speak to your client?

13              MR. WADE:  If I may, Your Honor.

14         (Mr. Wade spoke with the defendant off the record.)

15              MR. WADE:  I'm ready to proceed, Your Honor.

16              THE COURT:  All right.

17              MR. WADE:  We would call Caroline Robinson, my

18    client's mother, to the stand.

19              THE COURT:  Mrs. Robinson.

20              CAROLINE ROBINSON, called as a witness, being duly

21    sworn or affirmed, testified as follows:

22                        DIRECT EXAMINATION

23    BY MR. WADE:

24    Q    For the record would you please state your name.

25    A    Caroline Robinson.

1    Q    And what is your relationship with John Watson?

2    A    He's my son.

3    Q    And how -- when is your son's birthday?

4    A    My son's birthday is 6-16-1970.

5    Q    19 what?

6    A    '70.

7    Q    Okay.  How long has John Watson resided in the

8    Harrisburg community?

9    A    All his life.

10   Q    Was he born here?

11   A    Yes, he was.

12   Q    Where did he graduate from high school?

13   A    Well, out at John Harris.

14   Q    He attended the Harrisburg city school system?

15   A    Yes, he did.

16   Q    Public schools?

17   A    Yes.

18   Q    Does he have family in the area?

19   A    Yes, all his family is living here in Harrisburg.

20   Q    Where do you live?

21   A    I live in Harrisburg in the uptown area.

22   Q    Can you give us your address?

23   A    644 Dauphin.

24   Q    And how long have you lived there?

25   A    Well, we just recently moved in the house that we're

6

1   in.  It's a renovated house that we're planning on buying

2   eventually.

3   Q     Have you always lived in the Harrisburg area?

4   A     Yes, I lived in Harrisburg all my life.

5   Q     In your house is it Dauphin Street did you say?

6   A     Yes.

7   Q     In the Dauphin Street house how many bedrooms do you

8   have?

9   A     We have three bedrooms.  It's a two story home.

10  Q     And are all the bedrooms occupied?

11  A     No, it's two that's empty.  There is no one living

12  there but me and my husband.

13  Q     So you two are the only ones in the household at this

14  point?

15  A     Yes.

16  Q     Would you have room to if you were -- I have talked to

17  you about being a custodian for this court.  Do you recall

18  those conversations?

19  A     Yes.

20  Q     And as part of being a custodian you would be the eyes

21  and ears of the court.  Do you understand that?

22  A     Yes, I do.

23  Q     And part of that custodianship may be to provide a

24  place for John Watson to live.  Do you understand that?

25  A     Yes, I do.

1    Q    And are you able to provide that living space?

2    A    Yes, I am.

3    Q    As far as John's employment, are you aware where he's

4    been employed before?

5    A    Yes, he used to work for I think like Levin.  It was a

6    company that he worked -- well, I'm not sure of the precise,

7    you know, what type of work he did, but I know it involved

8    something like nuclear or something like that he worked for

9    quite some time.

10    Q    Have you ever heard of the company called Gannett

11    Fleming?

12    A    Oh, yes, that's it.

13    Q    Did he work for that company for a time?

14    A    Yes, he did.

15    Q    Do you know how long approximately he worked for that

16    company?

17    A    It was for a pretty good while.

18    Q    And this Mr. Levin, is he a store owner?  Do you recall

19    the name of the store Perks 'n Bribes here in Harrisburg?

20    It's a novelty type of store, card shop.

21    A    If I'm not mistaken, I think that was the first job

22    that he had was with Levin, that was the first one, and then

23    the other one that you said was the last one that he had.

24    Q    Do you know why that job did not last?

25    A    Which job, the last one?

1    Q    Yes, the most recent.

2    A    No, I don't because I still haven't really figured out,

3    you know, why he no longer works there because I know he

4    basically went to work every day, you know what I mean?  He

5    did a real good job.

6    Q    Who -- are there other family members in the Harrisburg

7    area besides yourself?

8    A    Yes, my mother lives here in Harrisburg.  My father is

9    deceased.  All his aunts and uncles, the ones that's left,

10   live here in Harrisburg also.

11   Q    And he has two sisters living in the Harrisburg area?

12   A    Yes, he does.

13   Q    And can you give me their names?

14   A    Well, he has a sister named Lisa Watson.  He has one

15   named Melinda Watson.  He also has another one named Trina

16   Watson.

17   Q    And they all live in the Harrisburg area?

18   A    Yes.

19   Q    Are you aware does he have any children?  Does John

20   Watson have a child?

21   A    Yes, he has a daughter.

22   Q    And what is his daughter's name?

23   A    His daughter's name is Shanese.

24   Q    And where does Shanese live?

25   A    Well, Shanese did recently live with him, you know,

1    until he was incarcerated, and now my daughter has her.

2    Q    Which daughter?

3    A    My daughter Lisa Watson.

4    Q    Who's Cashmere?

5    A    That's her name, Cashmere.

6    Q    Oh, okay, and didn't you say a different name, Shanese?

7    A    Did I?  I'm sorry, Cashmere, that's her name.

8    Q    Okay.  Cashmere is now living where?

9    A    She lives with a daughter Lisa Watson.

10    Q    And do you know whose legal custody Cashmere is in?

11    A    Yes, my son has legal custody.

12    Q    You're aware of your son's prior record, are you not?

13    A    Yes, I am.

14    Q    You realize he was convicted in New Jersey and did some

15    substantial jail time in New Jersey?

16    A    Yes, I do.

17    Q    Except for that episode in New Jersey has he always

18    lived in the Harrisburg area?  Except when he was serving

19    prison time in New Jersey has he always lived in Harrisburg?

20    A    He's always lived in New Jersey before then, yes.

21    Q    New Jersey or Pennsylvania?

22    A    I mean, he's always lived in Harrisburg before he was

23    incarcerated in New Jersey.

24    Q    Does he have any physical conditions or mental

25    conditions that you know of that require treatment?  Does he

1    have any diseases, for instance, medical condition?

2    A    Not that I'm aware of, no.

3    Q    Does he have any mental health problems that you're

4    aware of?

5    A    No.

6    Q    Do you know him to use drugs?

7    A    He's never used drugs.  He never even smoked a

8    cigarette or even drink a beer.

9    Q    Does he abuse alcohol, excessive use of alcohol?

10    A    He has never, he don't even drink.

11    Q    As far as finances go, how are his finances at this

12    point?

13    A    Broke.

14    Q    He's broke at this point.  So you don't know of any

15    large amounts of money that he could tap into or anything?

16    A    I'm going to be perfectly honest with you, I know for a

17    fact that my son has no money.  He didn't have none before he

18    went to jail, and he still don't have any.

19            MR. WADE:  That's all the questions I have.

20            MR. BEHE:  I have no questions.

21            THE COURT:  All right.  Mrs. Robinson, you stated

22    that your son had been convicted in New Jersey.  What was

23    that for?

24            THE WITNESS:  It was for drugs.

25            THE COURT:  It was for drugs?

1           THE WITNESS:  Yes, it was.

2           THE COURT:  Was he using drugs or selling drugs?

3           THE WITNESS:  Well, they were in his possession I

4    think at the time he was arrested.

5           THE COURT:  How old was he then?

6           THE WITNESS:  I think around maybe 18.

7           THE COURT:  He was in jail for how long?

8           THE WITNESS:  I think he did like 5 -- it was

9    either 5 and a half years or 6.

10           THE COURT:  And then he came back to Harrisburg?

11           THE WITNESS:  Yes, he did.

12           THE COURT:  And when was it that he started working

13    at the high school?

14           THE WITNESS:  Well, it was in 1999.  '99, I'm not

15    sure.

16           THE COURT:  And since he got out of jail in New

17    Jersey has he lived with you?

18           THE WITNESS:  Yes.

19           THE COURT:  All the time?

20           THE WITNESS:  Yes.

21           THE COURT:  He was living with you when he got

22    picked up for this?

23           THE WITNESS:  Oh, not the last time.  Well,

24    basically he was living there because he would come there,

25    you know, and he would stay, you know, and he had a fiancee,

1    you know, that he would spend maybe a night or, you know, he

2    would never stay out all night, but he would just go there.

3    But most of the time, you know, he was with me.

4              THE COURT:  He stayed there.  That's --

5              THE WITNESS:  He would never stay out all night.

6    He had a girlfriend that he would go over to her house, but

7    he never stayed out all night, he always came home.

8              THE COURT:  So he got his mail at your house?

9              THE WITNESS:  Yes, he did.

10             THE COURT:  Parked his car at your house?

11             THE WITNESS:  Yes, he did.

12             THE COURT:  All right, thank you.

13             MR. WADE:  If I may follow up, Your Honor, with a

14   question that you asked.

15   BY MR. WADE:

16   Q    Working for the Harrisburg School District he wasn't --

17   was he on their paid employee, was he a paid employee of the

18   Harrisburg School District?

19   A    From what I understand I believe he was.  I know he --

20   I'm almost certain that he was.

21   Q    Well, did he -- what type of things did you know him to

22   do for Harrisburg High School?

23   A    Well, I know he -- I'm not sure actually what he did.

24   I know he was there a lot, you know, because he participated

25   in helping with my grandson Lawrence Bethea.  He attended,

1    you know, all his games.

2    Q    He was at sporting events?

3    A    He was just about anything to do with any events he was

4    there.  So that's what I'm saying, I'm not really familiar

5    with, you know, familiar with what you mean when you say, you

6    know, worked there.  I'm not exactly sure what he did.

7    Q    But it involved mainly some after school activities, is

8    that what you understand his job was, or was it during the

9    school hours?

10   A    I'm not sure.

11   Q    Okay.  Have you ever seen a paycheck from the

12   Harrisburg School District?

13   A    I never seen none of his paychecks from no job he ever

14   had.

15   Q    Okay.  Well, all I'm getting at, is it possible that he

16   could have been a volunteer or recently employed rather than,

17   you know, a long time employment with the Harrisburg School

18   District?

19   A    I guess you could say that, yes.

20            MR. WADE:  Okay, that's all I have, Your Honor.

21            THE COURT:  Thank you.  Mr. Behe.

22            MR. BEHE:  Nothing, Your Honor.

23            THE COURT:  All right, thank you, Mrs. Robinson.

24            MR. WADE:  You may step down.

25            Your Honor, I'm going to call Lisa Watson, his

1    sister, to the stand.

2            LISA DENISE WATSON, called as a witness, begin duly

3    sworn or affirmed, testified as follows:

4            THE CLERK:  Please be seated and state your full

5    name for the record.

6            THE WITNESS:  Lisa Denise Watson.

7                        DIRECT EXAMINATION

8    BY MR. WADE:

9    Q    Miss Watson, how are you related to John Watson?

10   A    We have the same mother and father.  He's my brother.

11   Q    Are you his older sister or younger sister?

12   A    I'm the middle one.  I'm one under him but then there

13   is one under me.

14   Q    And at this time you're aware that he has a daughter?

15   A    Yeah, I'm aware, I have her everyday.

16   Q    And what's his daughter's name?

17   A    Cashmere Zhana Watson.

18   Q    And how did it come about that you ended up taking care

19   of Cashmere?

20   A    Well, Cashmere's mother had gotten into some trouble,

21   and she ended up out at Dauphin County Prison.  The charges

22   that she had included endangering the welfare of a child

23   because Cashmere was with her whenever, you know, they picked

24   her up.

25   Q    I probably didn't make myself clear.  Did you get

1    custody from Cashmere's mother or did you get the custody

2    from your brother?

3    A    From my brother.

4    Q    Okay, how and why was it that you got the custody of

5    Cashmere from your brother?

6    A    Because he got locked up.

7    Q    And he had legal custody of Cashmere prior to that

8    time?

9    A    Yes.

10    Q    So you have been taking care of her since April?

11    A    Yes.

12    Q    Do you know what's his attention to his daughter, how

13    close is he to Cashmere?

14    A    Very close, that's his only child.

15    Q    How old is Cashmere?

16    A    Three.

17    Q    Does she miss her father?

18    A    Yeah, she talks about him all the time.

19          MR. WADE:  I have no further questions, Your Honor.

20          THE COURT:  Thank you.  Mr. Behe, anything?

21                    CROSS EXAMINATION

22    BY MR. BEHE:

23    Q    Lisa Watson, --

24    A    Yes.

25    Q    -- is that correct?  I was trying to recall if I know

1    you or not, ma'am.  Perhaps I will remember.

2    A    Maybe.

3    Q    Have you testified for me as a witness in a murder

4    case?

5    A    Yes, with George or Ronnie Peppers.

6    Q    Yes, you were in the passenger seat when Jorge Drake

7    was shot to death in a drug related killing.  Is that

8    correct?

9    A    Yes.

10   Q    Are you familiar with your brother's employment

11   history?

12   A    A little bit.

13   Q    Do you know an individual by the name of Fred Jackson?

14   A    From a furniture store, yes, I believe.

15   Q    You understand Fred Jackson has been indicted

16   federally, did you know that?

17   A    No, I did not know that.

18   Q    Do you know if your brother ever worked for Fred

19   Jackson at National Imports, the furniture store?

20   A    Not that I'm aware of.

21           MR. BEHE:  Thank you.  That's all I have.

22           THE COURT:  Miss Watson, when your brother was

23   picked up on this charge, do you know where he was working?

24           THE WITNESS:  If I'm not mistaken, that's around

25   the time that they were talking about employing him at the

1    Harrisburg School District.  He had been to an interview and

2    everything up there, I remember that.

3              THE COURT:  Was he working full time some place

4    else?

5              THE WITNESS:  Before that I think he was doing -- I

6    think he was like a salesman or some type job.

7              THE COURT:  Where was that, do you know, in

8    Harrisburg?

9              THE WITNESS:  I know the office was located in

10   Harrisburg, but if I'm not mistaken, I believe sometimes he

11   had to go outside the Harrisburg area to do sales.

12             THE COURT:  Where is this little girl's mother now?

13             THE WITNESS:  She's home now.  She's on state

14   parole but she's still home.

15             THE COURT:  Okay, thank you.

16             MR. WADE:  I have no further questions.

17             THE COURT:  Thank you, Miss Watson.  You may step

18   down.

19             MR. WADE:  We're going to call Lawrence Bethea, his

20   nephew, Your Honor.

21             LAWRENCE BETHEA, called as a witness, being duly

22   sworn or affirmed, testified as follows:

23             THE CLERK:  Please be seated and state your full

24   name for the record.

25             THE WITNESS:  My name is Lawrence Bethea,

1    B-e-t-h-e-a.

2                        DIRECT EXAMINATION

3    BY MR. WADE:

4    Q      What is your relationship to John Watson?

5    A      He's my uncle.

6    Q      And how old are you?

7    A      Sixteen.

8    Q      And what, do you go to high school?

9    A      Yes.

10   Q      And what grade are you in in high school?

11   A      Eleventh.

12   Q      And during your -- do you play athletics?

13   A      Yes.

14   Q      What sports do you play?

15   A      Football, basketball and track.

16   Q      And have you had some difficulties at Harrisburg High?

17   A      Yes.

18   Q      And has Mr. Watson been able to help you out with any

19   of these difficulties?

20   A      Yes, he has.

21   Q      Could you tell us about what your uncle means to you

22   and how he's helped you out?

23   A      Basically he's like a father figure, you know, he's

24   kept me out of trouble, keep me on the straight path.

25   Whatever I needed, he's always there for me.

1    Q    So you have consulted with him?

2    A    Uh-huh.

3    Q    You have sought him out?

4    A    Uh-huh.

5    Q    Have others such as teachers and coaches sought Mr.

6    Watson out to help you specifically?

7    A    Yes, they basically called him before they had called

8    my mother or anything when I was in any situation.

9            MR. WADE:  No further questions, Your Honor.

10           THE COURT:  Mr. Behe, anything for this witness?

11                    CROSS EXAMINATION

12   BY MR. BEHE:

13   Q    You're currently in school?

14   A    Yes.

15   Q    How are you doing?

16   A    Fine.

17   Q    And you completed school last year?

18   A    No, I'm still in high school.

19   Q    I'm sorry, you were in school last year?

20   A    Yes.

21   Q    And your uncle was arrested in April of last year.

22   It's now October.  Are you doing all right?

23   A    Yes.

24           MR. BEHE:  Thank you.

25           MR. WADE:  I have no further questions, Your Honor.

1          THE COURT:  Thank you.  You may step down.

2          MR. WADE:  Your Honor, we have and I'm going to

3     produce as what I have marked Defendant's Exhibit 1.  There

4     were two people my office contacted to be here today.  One

5     was the principal of Harrisburg High School and the other was

6     the athletic director.  The Harrisburg High School principal

7     was at a meeting in Philadelphia and could not attend.  The

8     athletic director submitted a letter in lieu of his testimony

9     which I'll give copies to you.

10          (The document was passed to the Court.)

11          MR. WADE:  Basically, Your Honor, the letters --

12     the letter says that he's been extremely helpful,

13     particularly with Lawrence, but he also makes reference to

14     other students in the Harrisburg High School, that he's

15     always there to listen, comfort and nurture the students, and

16     if he could be of any further help, he would be happy to give

17     more information.

18          The principal, this is by way of proffer, the

19     principal said that if he didn't have this meeting, he would

20     be happy to be here and testify for him, and he said that he

21     hopes he gets released.  That's just his opinion, but that's

22     what he said.

23          We also have by way of proffer my client is on

24     state parole.  He's being supervised here by the state parole

25     office, it's actually New Jersey parole, and his parole

1        officer is a woman by the name of Jerri Williard, that's

2        J-e-r-r-i, and Jerri Williard said that -- we contacted her,

3        and she said that the defendant has been part of her caseload

4        for at least a year, that he's had no supervision problems

5        and that he has had no hot urines.  So apparently they are

6        testing, have urinalysis, and she said she was unable to make

7        this hearing due to another hearing.  So we contacted the

8        state parole people, Your Honor.

9               THE COURT:  How long has Mr. Watson or rather when

10       was he released on parole?

11              MR. WADE:  It was March 1996 I believe it was.

12              THE DEFENDANT:  March 13, 1996.

13              THE COURT:  And for what term?

14              THE DEFENDANT:  From March 13, 1996 until April 20,

15       2001.

16              MR. WADE:  2001.

17              THE COURT:  Okay.

18              MR. WADE:  That is all.  Well, let me confer with

19       my client if I may, Your Honor.

20              THE COURT:  All right.

21              (Mr. Wade spoke with the defendant off the record.)

22              MR. BEHE:  Your Honor, while he's conferring I just

23       bring to the Court's attention the pretrial services report

24       indicates parole supervision March 2, 1997 up to April of

25       2000.

1          THE COURT:  You know, Mr. Behe, I'm not sure that I

2     have a copy of that report.  Let me look through the court's

3     file while we're waiting here.

4          MR. BEHE:  You may have my copy, Your Honor.

5     Defense counsel and I have looked at it prior to the hearing.

6          (The document was passed to the Court.)

7          THE COURT:  Thank you.

8          MR. WADE:  Your Honor, I have no further testimony

9     to present if you wanted to hear argument.

10         THE COURT:  I would be happy to do that.

11         All right, Mr. Behe, do you have anything you want

12    to present?

13         MR. BEHE:  Your Honor, I prefer to wait to hear

14    what Mr. Wade has to propose to the Court in terms of a bail

15    package because quite frankly, all the information I heard so

16    far essentially is what's been contained in the pretrial

17    services report initially, and I have not heard yet what he

18    is prepared to propose to overcome the presumption or

19    guarantee the safety of the community or that the defendant

20    would appear.

21         THE COURT:  All right, Mr. Wade.

22         MR. WADE:  Your Honor, the pretrial services report

23    as it says, and it's unverified, this was done early on, was

24    not verifiable, we haven't verified it.  What I would propose

25    would be that his mother Caroline Robinson would be the

1   custodian and that she would have to report any violations of

2   any other conditions this Court might impose.  I feel that

3   the Court has the power to order home arrest or home

4   confinement if that's what you want.  You can order reporting

5   conditions.

6          The reason I suggest that, I think reporting

7   conditions are enough.  He has been on parole.  He has been

8   reporting.  He has not, you know, fled the area.

9          From my understanding of this case, when he was

10  arrested, he was called down to the police station, he showed

11  up.  So I don't see this -- and he has many ties to the

12  community.  I don't see this as a case of a risk of flight of

13  Mr. Watson, that you have to worry about a risk of flight.

14         I can understand the seriousness of these charges.

15  The main tenet you have to look at is protecting the safety

16  of the community and any person.  There has been no evidence

17  here that a single person is in danger, okay.  So there the

18  government hasn't showed that, you know, we're concerned

19  about this witness or that witness, so we don't have that in

20  this case.

21         So I presume that they are relying on the

22  presumption that this is a drug case and there could be drug

23  dealing in the community.  If that were the -- if that's

24  their reasoning, I think you could fashion conditions that

25  could allay that fear by home confinement and no association

1   with known criminals, that type of -- I think he has to do

2   that anyway with state parole, I don't think he can associate

3   with known criminals.  So those conditions are available to

4   the Court.

5            He doesn't have the financial resources to post a

6   house or, you know, he doesn't have any money to post a bond,

7   but you could have him sign a promise to pay that if he

8   failed to appear or abide by the conditions of the court,

9   that he forfeited money in the future.

10           I think those would be enough to assure his

11  appearance and protect the safety of the community enough so

12  that the presumption that I admit the presumption in this

13  case has arisen due to the nature of the charges, but that

14  due to the testimony of the family, his connections to

15  Harrisburg, the fact that he's been under state parole

16  supervision, I don't think he'll run, and I think you can

17  assure that he won't be a danger to the community.

18           THE COURT:  Mr. Behe.

19           MR. BEHE:  Yes, Your Honor, first I'd like to say

20  that my remarks aren't directed at all against the family

21  members, they seem to be good folks who come here and like in

22  many instances are quite surprised by the circumstances, but

23  then again you can't judge a book by its cover, and many

24  people are caught unaware as to what other people are doing,

25  and, like I said, my comments aren't directed towards them at

1    all.

2          Mr. Wade indicated that one of the matters that

3    should allay any concerns that we have that the defendant

4    would pose a danger to the community or flight risk is the

5    fact that he was under parole supervision.  That's precisely

6    one of the reasons why he should not be released, because the

7    allegations contained in the indictment and determined by the

8    grand jury to be established by probable cause is while he is

9    on supervision he's engaged in the very conduct that had him

10   convicted in the first place.  So Mr. Wade sees that as some

11   sort of evidence that the defendant will not flee or pose a

12   danger, I submit it's exactly the opposite.  The allegations

13   are that he was engaged in criminal activity at a time when

14   he should not have been -- that he should ever have been.

15         Also Mr. Wade had expressed to the Court the fact

16   that the United States had not mentioned any particular

17   witness as being at risk or in danger in this matter if the

18   defendant were released, and that's at this point correct

19   because he's not out on the streets, he's in pretrial

20   detention.  My concerns would change because the witnesses we

21   have spoken to have expressed concerns to us about their

22   safety and some are quite reluctant, although they agreed to

23   testify, but the fact of the defendant's incarceration

24   appeared to mollify them somewhat of their concerns in this

25   regard.

1          Your Honor had asked questions about the

2     defendant's employment with the Harrisburg School District.

3     This may not be dispositive, but I think it's important to

4     bring to the Court's attention back in I believe either July

5     or the beginning of August Your Honor had a hearing to review

6     the detention order, and Mr. Abeln, who previously

7     represented the defendant, had filed a motion to review the

8     detention order with the Court, and one of the bits of

9     information that was brought to the Court's attention, what

10    Your Honor considered that could have been used to have this

11    defendant released, was found in paragraph 9, subsection (d)

12    that said the defendant was employed at the time of his

13    arrest at the Harrisburg School District where he worked as a

14    security guard.  That's false.

15          We have here today Chief Dillard from the

16    Harrisburg School District who could testify that the

17    defendant asked to be employed but at no time was he employed

18    at the Harrisburg School District at the time of his arrest,

19    before the time of his arrest, as a security guard.  In fact

20    Chief Dillard strongly opposed that.

21          So while there was no information at that hearing

22    to present to Your Honor about that, I was not at that

23    hearing, I just bring to the Court's attention that there was

24    a factual representation to you that may have swayed you one

25    way or the other about the defendant's employment in this

1    regard that just is not true.

2         We also have information that has led to the

3    superseding indictment and the charge against the defendant

4    that was returned by the grand jury on Wednesday of this week

5    concerning the defendant's purchase of the vehicle that's

6    referred to in the pretrial services report, a 1994 Isuzu,

7    and at the time I believe in the pretrial services report the

8    defendant indicated that he had worked for Gannett Fleming

9    and was laid off in September of that year 1999.  We obtained

10   documents from that automobile place.  The defendant

11   indicated in his application for a loan to purchase that

12   vehicle that he worked at National Imports, the furniture

13   place that Fred Jackson owned.  He did not work at National

14   Imports and was not employed by Fred Jackson.  And the

15   information that will be heard by a jury at trial is that

16   that automobile was purchased in part by crack cocaine, and

17   witnesses will come and testify to that as well as other

18   witnesses who will testify to the various drug dealings that

19   they had with this defendant.

20        In Mr. Wade's motion he correctly points out to

21   Your Honor that there are four factors to consider on

22   deciding whether or not there are conditions of release that

23   will reasonably assure the appearance of the defendant as

24   required and the safety of any other person in the community,

25   and he lists those four factors.  The first one is the nature

1    and seriousness of the offense charged, but Mr. Wade, I'm

2    sure not intentionally, neglected to include what follows

3    that phrase in the statute in 3142, the nature or the

4    circumstances of the offense charged, including whether the

5    offense is a crime of violence or involves a narcotic drug.

6    Those two offenses are types of offenses that are

7    specifically listed by Congress as being the types of crimes

8    that give rise to the presumption that an individual,

9    particularly one who is on parole for the very type of crime

10   that the defendant is now charged with, poses a danger to the

11   community, not individuals per se but by the very activity

12   that has given rise to the charge here.

13           I submit that based on what has been proposed so

14   far the presumption has once again not been overcome.  If

15   Your Honor believes otherwise, we'd be prepared to present

16   testimony, but I don't believe at this point in time that

17   there would be any need to do so.

18           THE COURT:  All right.  Mr. Wade, do you wish to

19   respond?  Do you need a minute?

20           MR. WADE:  Yes, Your Honor.

21           (Mr. Wade spoke with the defendant off the record.)

22           MR. WADE:  Yes, Your Honor, I would like a chance

23   to respond.  First of all, the government talked about, you

24   know, that because he's currently been detained he hasn't --

25   the government doesn't have any concerns about their

1    witnesses.  Well, this is the first we have heard about that

2    right from the podium, that there are witness concerns.

3           Normally if you look at some of the cases, I want

4    to cite you a case on that, if I may have a moment here, the

5    United States v. DeAmelio.  A lot of these detention cases

6    the government presents very strong evidence of threats to

7    the individual, they have tapes, they have had police

8    officers witness the threats upon the arrest of the

9    defendant.  The defendant said, "I'm going to get you.  I'm

10   going to get your family."  This is not that type of case.

11   All we have is the government's proffer that there are some

12   witnesses out there that feel uncomfortable.  We don't know

13   what the uncomfortable level is.  Anybody testifying in a

14   federal courtroom probably feels uncomfortable, particularly

15   if they are facing their accusers.  So I don't know the

16   degree, if there has been violence before.  I suggest that we

17   can't say that the presumption wasn't rebutted by this

18   proffer.  There may be witnesses that feel uncomfortable.

19          As far as the Harrisburg School District employment

20   or non-employment, no one in this courtroom -- I haven't

21   urged that he's been employed by the Harrisburg School

22   District.  Mr. Abeln may have urged that in his motion but

23   presented no testimony on it.

24          By way of proffer now, my understanding is he

25   volunteered a lot and then was on like a training period with

1    the Harrisburg School District, and my client indicates that

2    the principal was responsible for that training period, and

3    he said he has actually filled out some paperwork like a W-4

4    form and that that could be produced, so I think that is the

5    true nature.  I don't know that he's been receiving a

6    paycheck from the Harrisburg School District, but obviously

7    the school district personnel are aware of my client.  The

8    principal was willing to come in except for his commitment in

9    Philadelphia, and the athletic director sent over his letter,

10   so I don't think there is any question that he has some

11   involvement with the Harrisburg School District, so I don't

12   think that that is ground too that that makes any weight at

13   this point.

14        There is no question this is a presumption of

15   detention case.  The charge itself makes a presumption of

16   detention case, but that charge only what it does is when

17   it's invoked, the presumption of detention gives the Court a

18   duty to inquire as to that detention, and whether detention

19   is appropriate is an individual call in each and every case.

20        The DeAmelio case, I guess I didn't give you the

21   cite, but it's only found in a Westlaw cite, it doesn't have

22   a Fed Sup cite, it's 1998 Westlaw 800345, it's from the

23   Eastern District of Pennsylvania.  It was a decision in

24   November 16, 1998.

25        That decision sets up a good framework to review

1    these types of cases, sets the four factors to look at.  And

2    that case was an extortion of credit transaction where the

3    witness they were afraid of was shot, they shot a bullet next

4    to the guy's head if he didn't pay up, and they made certain

5    threats like, "If you don't pay up, I'm going to be the one

6    that has to kill you, and if I have to kill you, I'll make

7    sure it's one clean shot."  I'll give you that much, that

8    type of thing.  So much stronger cases to be concerned about

9    the community than in this case.

10            I would say the testimony you received here has

11    rebutted the presumption, that there are conditions that he

12    can be released.  If Mr. Behe wants to put on evidence of the

13    weight of their case, that's one of the factors, Your Honor.

14    There really has been no, other than the indictment, you

15    don't have any -- you have heard the suppression hearing, and

16    you have read the search warrant affidavit in the state

17    court, but there is really nothing, you know, to base what

18    the weight of this case is other than the grand jury finding

19    of probable cause if there is such a crime.

20            Based on that I would suggest we have rebutted the

21    presumption, and now the government has the duty to prove to

22    you by clear and convincing evidence that he should be

23    detained.  I don't think they have done that.

24            MR. BEHE:  May I make one or two comments?  I agree

25    with Mr. Wade, I was not asking the Court to determine that

1     the presumption was hinging upon threats to witnesses or

2     fear, that would not factor, does not factor into my position

3     in that regard, only as it was only mentioned in regard to

4     Mr. Wade's comment that we heard no testimony about any

5     individual who was threatened or at risk.

6          I neglected to bring to the Court's attention

7     another consideration, not only the danger to the community

8     but flight risk.  We focused upon the defendant's conviction,

9     a very serious one in New Jersey that caused his

10    incarceration for a substantial period of time.  He also has

11    another drug conviction in Dauphin County.  He's got a

12    forgery conviction as well.  I believe those two convictions

13    would qualify him as a career offender.  Your Honor can

14    appreciate the serious nature or the serious consequences

15    that flow from an individual who is convicted of a drug

16    trafficking offense who is also designated as a career

17    offender.

18         I have found and I think the courts find that the

19    likelihood of a substantial term of imprisonment is one

20    factor that weighs upon an individual's decision whether they

21    would appear in court or not appear in court.  So all of the

22    factors that I have outlined are I believe supplemented by

23    the fact that he has more than one prior drug conviction, a

24    forgery conviction as well and because of the substantial

25    term of imprisonment that the defendant faces if convicted

1    that leads again to the raising of the presumption and

2    supporting it that he would not appear as required.  I do not

3    believe that presumption has been overcome.

4          THE COURT:  All right, thank you, Mr. Behe.  Mr.

5    Behe, I know that because of your trial schedule you have not

6    been here for some of the proceedings that we had in

7    connection with this case, but just to sort of catch you up,

8    and you too, Mr. Wade, to come to think of it, you have been

9    I think the second or third lawyer to appear on behalf of Mr.

10   Watson and even appear on his own behalf for a while.  But a

11   couple of things, my clear recollection, although it's not

12   going to be important for purposes of this hearing, is that

13   when Mr. Watson was here on one prior appearance he did

14   advise me that he was working for the Harrisburg School

15   District.  I really felt that that information -- I took it

16   at face value, but I felt that it really cut both ways to be

17   quite honest with you because even though full-time

18   employment is usually a good thing and an indication of

19   stability and a good indicator of lack of danger to the

20   community, I thought that a person charged with drugs or drug

21   possession or sale would not be well employed at a school

22   district.  So I really sort of discounted that in any event.

23          The other thing is that I indicated to Mr. Watson

24   in an earlier hearing that I was concerned about his

25   detention in this case because I did review the documents in

1    connection with a prior hearing that we had on suppression of

2    evidence, and Mr. Watson's name appeared nowhere.  I wasn't

3    sure at all what evidence was before the grand jury to hold

4    him on this charge.  I know that that doesn't matter, that

5    legally there is a presumption that there is probable cause,

6    the grand jury found probable cause, but I was concerned that

7    a man would be held for this long with the continuances that

8    were happening in this case without anybody even looking at

9    it.  And a conspiracy charge, as we all know, sometimes is a

10   charge that gets filed when it looks like nothing else will

11   stick.  So I was very concerned that Mr. Watson would be

12   wrongfully held for a very long period of time with nothing

13   coming of it.

14        This morning when I received the superseding

15   indictment I think the tenor of this whole thing changed.

16   The charges are now even more serious, and obviously there

17   has been a grand jury finding of probable cause in connection

18   with those new charges.  The prior charge and this new

19   charge, of course, create a strong presumption that there is

20   a danger to the community if Mr. Watson is released, and then

21   it's his burden to rebut that presumption.

22        His family has stood by him, and they are willing

23   to take custody of him so-to-speak.  I think they present

24   convincing evidence that Mr. Watson is not a flight risk, but

25   I don't think that the testimony presented this morning can

1    overcome that presumption that he does pose a danger to the

2    community based on his record, the fact that he was on parole

3    when this occurred, the seriousness of the charges.  He was

4    living with his mother when these charges occurred.  I can't

5    believe that Mrs. Robinson could be charged with taking

6    custody of him and protecting the community from the threat

7    that apparently exists here, so I cannot find that the

8    presumption that he's a danger to the community has been

9    overcome and that I could lawfully release him based on what

10   I have heard here, so the detention order will stand.

11          We'll have to, Mr. Wade, be thinking about how

12   we're going to get this case on the trial docket so that Mr.

13   Watson is not going to be detained longer that he needs to

14   be.  Has he been arraigned?

15          MR. WADE:  No, Your Honor.

16          THE COURT:  Is that on Judge Smyser's docket?

17          MR. BEHE:  I'm sure it will be shortly, Your Honor.

18   Since it occurred Wednesday, I don't believe it's been placed

19   there.

20          THE COURT:  Mr. Behe, is it your intent to

21   consolidate the charges and try them at once?

22          MR. BEHE:  Because they are included in the

23   indictment along with all the other charges, they would be

24   tried together.  There would be no motion forthcoming from me

25   to consolidate them.

36

1          THE COURT:  And the other defendants, Mr. Elliott

2    is no longer --

3          MR. BEHE:  Mr. Elliott has signed a cooperation

4    plea agreement with the United States.  I'm just assuming

5    that that will be scheduled for a change of plea shortly.

6    That leaves Mr. Morrison and Mr. Watson as co-defendants in a

7    joint trial.

8          THE COURT:  Is it your understanding that Mr.

9    Morrison intends to proceed to trial?

10         MR. BEHE:  Presently that's his intention.

11         THE COURT:  So with this new indictment it's your

12   expectation that this case would be tried in November as

13   scheduled?

14         MR. BEHE:  Under the rule I believe the defendant

15   is entitled to 30 days, but he's certainly free to waive his

16   right to 30 days.  The new charge that was brought is based

17   in part on previous evidence as well as additional evidence,

18   and since the indictment was returned Wednesday, counsel, of

19   course, has not had an opportunity to sit down and engage in

20   any meaningful discovery about what this additional evidence

21   would be, but I don't believe it would affect the starting

22   date for the trial or lend itself to any pretrial motions

23   that would in any way delay the trial, but I'm speaking just

24   for me.

25         MR. WADE:  We'll try to get that sorted out before

1    the arraignment on the new charge, Your Honor.  We haven't

2    had a chance to consult.

3             THE COURT:  All right, thank you.  We'll be in

4    recess.

5             (The proceedings concluded.)

6         I hereby certify that the proceedings and evidence

7    of the court are contained fully and accurately in the notes

8    taken by me on the revocation of detention order hearing of

9    the within cause and that this is a correct transcript of the

10   same.

11

12                           *Monica L. Zamiska*

13                        Monica L. Zamiska, RPR

14                        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25